**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-0050 (CRC)** |
| **v.** | : | |
| | : | |
| **KATHERINE STAVELY SCHWAB,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Katherine Stavely Schwab to a term of 90 days of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

## I.     Introduction

Defendant Katherine Stavely Schwab, a 34-year-old former realtor, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]  Schwab participated in the violence and reveled in it after the attack.

---

[1] Although the Statement of Offense in this matter, filed on August 18, 2022 (ECF No. 83 at ¶ 6) reflects a sum of more than $1.4 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount

Defendant Schwab pleaded guilty to one count of violating 18 U.S.C. § 1752(a)(2).[2]  As explained herein, a sentence of incarceration is appropriate in this case because (1) Schwab anticipated and prepared for potential violence on January 6, 2021; (2) she chose to join the crowd at the Capitol after learning that it was the site of an ongoing riot; (3) when entering the Capitol, Schwab could see broken windows and hear blaring alarms; (4) after Schwab exited from the Capitol building, she observed and recorded video on her mobile telephone of police officers struggling to disperse the crowd; (5) Schwab shouted epithets at the officers who were valiantly trying to protect the Capitol and its lawful occupants, calling them "traitors" and thereby possibly inflaming the crowd; (6) Schwab shouted for others to resist police efforts to disperse the crowd; (7) outside of the Capitol, Schwab joined a Facebook livestream and announced that she "stood my ground"; (8) as rioters violently destroyed press equipment in a media enclosure, Schwab joined others in shouting insults intended to incite further violence; (9) Schwab then joined the violence, throwing and kicking equipment; and (10) Schwab later lied to the FBI.

The Court must also consider that Schwab's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to disrupt proceedings and to overwhelm police officers who were trying to prevent a breach of the Capitol building. Here, the facts and circumstances of Schwab's crime support a sentence of 90 days of incarceration, in the middle of the 0 to 6 month Sentencing Guidelines range, one year

---

reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Schwab was jointly charged in this case with Jennifer Leigh Ryan ("Ryan") and Jason Lee Hyland ("Hyland"). Following her plea of guilty to violating 18 U.S.C. § 5104(e)(2)(G), ECF 38, 39, this Court sentenced Ryan to 60 days' incarceration, a special assessment of $10, and restitution in the amount of $500. ECF 56. After Hyland's plea of guilty to Section 5104(e)(2)(G), ECF 65, 66, this Court sentenced him to 7 days' incarceration, a special assessment of $10, restitution in the amount of $500, and a $4,000 fine. ECF 80.

of supervised release, 60 hours of community service, and $500 in restitution.  Schwab led her

codefendants, Jason Lee Hyland and Jennifer Leigh Ryan, into the Capitol building, entering ahead

of them and intruding, unlike Ryan or Hyland, into the Rotunda.  Of the three defendants charged

in this case, only Schwab engaged in violence by joining others destroying press equipment.  As

detailed below, her conduct warrants a term of incarceration.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the

attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### Defendant Schwab's Role in the January 6, 2021 Attack on the Capitol

In early 2021, Schwab agreed to travel with others in Hyland's personal aircraft to attend

the Save America rally in Washington, D.C.  Hyland had invited Schwab and Ryan to fly with him

to the rally on January 6, 2021.  Schwab and Ryan each invited another person who joined the

group; these additional travelers have not been charged.

By January 4, 2021, Schwab and the others were exchanging group messages in preparation

for the trip.  Even before her departure, Schwab's initial messages were concerned with potential

violence.  She sent a group text on January 4, 2021 asking, "Are we going to conceal carry (tho

not legal there) as a just in case for protection?"[3]  Later that day, Schwab followed up with a

message asking, "So excited for this!  What protective measure are we doing?  I agree with

covering our faces."  Hyland responded that the District of Columbia was strict on guns, he planned

to carry a pocket knife, and it seemed important to stick with a group.  An uncharged participant

offered to provide the group with "bulletproof backpacks" so "everyone would have an extra level

---

[3] Copies of text messages referenced in this Memorandum are attached in Exhibit One.

of protection, just in case." Schwab and the others accepted this offer. Schwab also reported that she conferred with a friend employed by the government who advised "for us to leave our guns at home."

Schwab also wrote on January 4 that she, Hyland, and another member of the group "will be in the center, most likely shit will go down. As much as I want to avoid it, I also want to stand my ground and defend myself and my rights against those fascist groups [.]" Six minutes later, in another message to Hyland, she wrote, "we have to stop the steal. I have a feeling this will be the most backlash from us in any given rally if it doesn't happen[.]"

On January 5, Schwab and others boarded Hyland's plane and flew from Texas to a Manassas, Virginia airport and then checked into a District of Columbia hotel. ECF 83:4.

On January 6, the group left their hotel at 7 a.m. to walk to the Ellipse to attend the rally. *Id*. During the 20-minute walk, Schwab strode eagerly ahead of the others. After the rally, the group walked to the Capitol. *Id*. Ryan made a recording of the group walking near Fourth Street and Pennsylvania Avenue, N.W. where she explained that they were going back to the hotel because they were freezing and their feet hurt. Instead of going to the Capitol, Ryan stated, "we're gonna watch it on TV." The recording continued as four of the five members of the group, including Schwab, boarded a pedicab and returned to the hotel. The fifth person in the group decided to continue to the Capitol.

After returning to the hotel, Schwab, Hyland, and Ryan watched a news broadcast together while Ryan recorded herself and her codefendants as images of rioters breaching the Capitol appeared on television. In this recording, created on January 6 at 2:20 p.m., *see* ECF 51-1, Ryan exclaimed loudly and repeatedly over the broadcast that "They're climbing the walls at the Capitol!" Schwab appears in the recording, observing that a hat worn by a rioter on the television

4

resembled one worn by the friend who had decided to continue to the Capitol.  As the recording concludes, Ryan declared, "We're gonna go down there.  And were gonna sit in those – we're gonna go move them outta their chairs.  We're going down there.  Because we've had it.  We're not here to play around."

Messages recovered from Schwab's phone from this period include the following:

Patriots just stormed the capital [*sic*] building

Broke through the baracades [*sic*]

They stormed the building INSANE

fuck pence

Like her codefendants, Schwab received a text at approximately 2:27 p.m. from a member of her group that forwarded a tweet describing violence at the Capitol.  The tweet included an image of the riot and reported:

BREAKING:  Trump supporters have breached all security barriers and are now actively destroying and occupying the Capitol building

I repeat.  The Feds have lost control of the Capitol building

Revolution in progress

Not a drill
…

BREAKING: Trump supporters have breached the Capitol building, tearing down 4 layers of security fencing and are attempting to occupy the building – fighting federal police who are overrun

This is the craziest thing I've ever seen in my life.  Thousands, police can't stop them



Approximately ten minutes later, Schwab, Hyland and Ryan left their hotel for the Capitol. [4]

They approached the building's East Front and made their way through the crowd and up steps to the East Rotunda doors.  Schwab was the first to arrive at the doors, leading the way ahead of Hyland and Ryan. ECF 83:4; PSR ¶ 30.  She entered the Capitol ahead of her codefendants, who were not even visible in surveillance footage of the entrance when Schwab appeared on camera at the front of a crowd that surged into the building, pushing past Capitol police officers in the doorway who were attempting to block entry.  Schwab entered the Capitol at approximately

_____

[4] At approximately 2:37 p.m., Ryan sent a group text message, attached, to the individual who decided to continue to the Capitol rather than return to the hotel.  The message, which was also sent to Schwab and to Hyland, stated "We're on our way [name of person already at the Capitol]." This message was also recovered from Schwab's phone.

3:21:03 p.m.  As reflected in the images below, and contrary to her other claims, Schwab was not "invited in" through the East Rotunda doors; nor did officers passively allow entry.[5]  As Schwab entered with the crowd, she passed visibly broken glass panes in the doors.  Alarms were blaring and the presence of tear gas was evident.



*Figure 1 showing Schwab beneath a red arrow at approximately 3:20:54*

---

[5] Schwab's mother reported this claim to the Probation Officer preparing the PSR. PSR ¶ 68. Schwab's own statements are described below.



*Figure 2: An enlarged image from open-source video of Schwab, in a yellow box, as she enters*

Once the crowd surged past police officers, Schwab approached the entrance to the Rotunda where she remained for several minutes. At approximately 3:21:28 p.m., Ryan and Hyland followed Schwab into the Capitol; unlike Schwab, however, after 90 seconds they both left the building. By at least 3:24 p.m., Schwab had entered the Rotunda as police officers were attempting to conclude efforts to expel rioters from that area.



*Figure 3: Schwab, circled in red, inside the Rotunda*

Approximately two minutes later, police officers directed Schwab and others out of the Rotunda and then, at 3:28 p.m., out of the building through the Capitol's Memorial Door.  After her exit, Schwab rejoined Hyland and Ryan.  The three participated in a Facebook livestream where Schwab proudly declared that "I went into the fucking Capitol building" and "I made my movement, I stood my ground."

Although officers had expelled her from the building, Schwab remained by the Capitol building for over an hour.  She recorded herself urging rioters to resist police officers' attempts to disperse the crowd.  When the officers deployed a stun grenade, Schwab shouted, "It's just a flash-bang, what the fuck man," followed by repeated exhortations to "Stand your ground!" She admonished the crowd to "stand up for what's right, it's not fuckin' right" and "we're here for a reason."

Instead of leaving, Schwab and Hyland climbed a few steps at the Capitol's exterior and recorded officers below who struggled to move the crowd while Schwab and Hyland called them

"traitors" and "sheep." Officers above Schwab and Hyland moved them and others down the steps and away from the building. Schwab's insults towards the officers worsened as she shouted, "You want to fuck with us, you want a revolution, you want a fuckin' revolution, it'll happen." She referred to at least one officer repeatedly as "a fuckin' pussy" and told the group of officers that they were "pathetic pieces of shit" who were "all going to burn in hell."



*Figure 4: Rear view of Schwab and Hyland recording officers below*



*Figure 5: Side View of Schwab and Hyland Recording*



*Figure 6: Front View of Schwab and Hyland Recording*

Figures 4-6 above show Schwab and Hyland as they recorded images including those shown below.



*Figure 7: screenshot from recording by Schwab*



*Figure 8: screenshot from recording in Hyland's phone*

After her excoriating remarks to officers who were themselves subject to physical attacks

as they defended the Capitol, Schwab finally ended her unlawful presence next to the building.



*Figure 9: Schwab and Hyland moving away from the Capitol*

She moved to a media enclosure where Hyland and later Ryan were with her.  Schwab continued her aggression at the enclosure but no longer restricted herself to verbal assaults.  At first, she observed other rioters during their efforts to destroy press equipment.  As she watched rioters douse the equipment with water, jab at it with poles,  and even make attempts to light the equipment on fire, Schwab screamed inflammatory remarks that included "Fuck you, Associated Press" and "burn it!"  She witnessed the attacks below, and she can be seen in some of these images:



*Figure 10*



*Figure 11*



*Figure 12*



*Figure 13*



*Figure 14*



*Figure 15*



*Figure 16: Schwab As She Yells "Light It Up!"*

Schwab did not simply incite others from the sidelines.  She participated in efforts to destroy property.



*Figure 17*



*Figure 18*

Later that evening, Schwab was unrepentant.  During another group livestream from her hotel, Schwab declared with pride, "I stormed the Capitol."  Addressing any livestream viewers with negative comments, Schwab added, "we'll show you what we did at the Associated Press" and "we will show you what Patriots did to the Associated Press;" she agreed when Ryan interjected that what happened to the Associated Press "was not pretty." Somewhat incongruously, Schwab also claimed:

> There was no vandalism. All we did was push the doors open.  All we did.  And we went back in because Pence fucked us over.  … For everybody, for everybody that like wanted this, come January 20, OK, cool, I don't wanna hear shit next year, I don't want hear a damn thing; I don't wanna hear look what our country's turned to … and all these municipal police in DC can kiss my ass; they beat people, they hit them, and the only way you saw it was we fought back …

The following day, Schwab and her group returned to Texas in Hyland's plane.

*Schwab's Interview with the FBI*

On January 15, 2021, FBI agents investigating the attack on the Capitol interviewed Schwab in her home.  The agents urged Schwab to be truthful, and she assured them that she had

nothing to hide.  She declined to identify Hyland, but did provide an account of attending the rally at the Ellipse; walking to the Capitol and deciding to return to the hotel; and watching the news after arriving there.  She admitted to seeing news coverage of the breach of the Capitol from the hotel.  Although Schwab maintained that she did not condone violence, she said that after viewing news of the breach, she and her group decided to return to the Capitol.

Schwab said that she approached the Capitol from the Supreme Court side.  She described a large crowd that was pushing her towards the building.  She denied seeing any violence, noted that the Capitol police were "very sweet," but also noted that she "did see that someone had destroyed the front door but we weren't there for that."

Schwab described going inside of the Capitol briefly, and very generally.  She volunteered that after her entry, she saw "the National Guard" and some people on their knees with their hands behind them as if they were in custody.  She said an officer directed her to an exit.  According to Schwab, once she was outside, some flash-bangs went off and "there was something else going on" at the side of the building.  She stated that next she went to see what was "going on with the media."  According to Schwab, "it was just getting worse" and curfew was coming, so she and her group left around 5:00 p.m. when it was starting to get dark and "that was it."   She added that "the last thing I would do is condone violence on the Capitol or on anybody else."  She claimed her presence at the Capitol had nothing to do with one side or the other; she was there "for the American people."  Schwab also remarked that she had not realized "being willingly allowed into something" and then being "told to exit by a Capitol police officer" would lead to the circumstances she found herself in by the time of her interview.

Schwab told the FBI that she knew she wanted to walk into the Capitol because "the doors were open."  She said that Ryan had also entered the Capitol, but denied that the person she did

not want to name (i.e., Hyland) had done so. Towards the end of the interview, when agents advised

her again about the importance of telling the truth and provided an opportunity to correct any part

of her statement, Schwab responded by saying that the worst of her behavior on January 6 "was

just the chanting and stuff." Agents showed a photograph of Hyland to Schwab and asked if she

could identify the person in the photograph.  Schwab falsely claimed she could not recognize the

person in the photograph.[6]

*The Charges and Plea Agreement*

On January 28, 2021, Schwab was charged by complaint with violating 18 U.S.C.

§§ 1752(a)(1) and (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  ECF 7. On February 1, 2021,

Schwab self-surrendered to United States Marshals in the Northern District of Texas and was

placed under arrest. ECF 25:4.  On June 7, 2021, she was charged in a second Superseding

Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D), (F)

and (G).  ECF 34.  On August 18, 2022, she pleaded guilty to Count Two of the second Superseding

Information, charging her with violating 18 U.S.C. § 1752(a)(2).   ECF 82, 84.  In her plea

agreement, Schwab agreed to pay $500 in restitution to the Architect of the Capitol.

## III.   Statutory Penalties

Schwab now faces a sentencing on a single count of violating 18 U.S.C. § 1752(a)(2). As

noted by the plea agreement and the U.S. Probation Office, she faces up to one year of

imprisonment and a fine of up to $100,000. Schwab must also pay restitution under the terms of

---

[6] In a subsequent FBI interview of Hyland, he described January 6 as his first date with Schwab. *See* PSR ¶ 69 (noting that Schwab has been in a romantic relationship with Hyland for the last two years).  Thus, their relationship was on-going when the FBI interviewed Schwab and she falsely denied recognizing Hyland's photograph.

her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

**The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Schwab's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2A2.4(a)) | +10 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | - 2 |
| Total Adjusted Offense Level | + 8 |

*See* PSR at ¶¶ 46-51.

The U.S. Probation Office calculated Schwab's criminal history as a category I. PSR at ¶ 57. Accordingly, the U.S. Probation Office calculated Schwab's total adjusted offense level, after acceptance, at 8, and her corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 55-57, 122. Schwab's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged numerous persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## IV.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a term of 90 days of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Schwab's

participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Schwab's case is its violent conclusion. Although she later told the FBI that she had never attended a rally for Trump involving anything like the violence she witnessed on January 6, Schwab nevertheless anticipated that the day would bring violence and "backlash" and that "most likely shit will go down" with her friends in the center of it. She even contemplated breaking the law to prepare for the violence she predicted by bringing a concealed firearm to the District of Columbia. Cold weather and sore feet were initially enough to keep Schwab from breaching the Capitol and its grounds; however, news of a riot was sufficient to summon her from her hotel and back to the Capitol grounds. Schwab broadcast reports of violence at the Capitol to others, and then led her codefendants into the building.

After her removal from the Capitol's interior, Schwab could not have missed assaults against the officers outside of the building from her vantage on its steps; some of those assaults appear in her mobile phone recording as shown above in Figure 7. Her insults to those officers as they attempted to clear the area were not only abusive but carried the potential to incite others to violence. Schwab ultimately left the area officers sought to clear only to join the violence of rioters attempting to destroy media property. Schwab threw and kicked press equipment and encouraged other rioters to "burn it" and "light it up," which they did. Her enthusiastic participation in the destruction of property and her incitement of others to do the same is more than sufficient to justify a sentence of incarceration.

Apart from her willingness to propose carrying arms in violation of what she knew to be District law, Schwab's conduct on January 6 demonstrated her persistent disregard for the law and those who enforce it, making her offense more serious and aggravated. She was part of a crowd

that forced its way past officers and into the Capitol.[7] Once back outside, she scoffed at the efforts of officers to disperse the crowd with stun grenades, and urged the crowd to "stand your ground" instead of leaving as directed.  Assaults against those officers made no impression on Schwab; instead, she verbally abused the police and sought to justify her invective because an officer had pushed another rioter who confronted him.[8]  Her conduct showed no respect for the law or the officers present to enforce it.

Schwab's decision to breach the Capitol building in the first place should not be overlooked.  She could not have missed officers gathered in the doorway blocking entry, and could not have overlooked the need for the crowd massed outside to force its way in.  She observed but disregarded broken glass in the doors, the sound of alarms, and the scent of tear gas and chemical irritants.  Schwab intruded further into the Capitol than either of her codefendants and remained inside of the building for a longer amount of time.  She entered the Rotunda at a time when officers were attempting to conclude efforts to clear that location from a large crowd that had entered earlier.  Her presence not only frustrated those efforts but created an additional distraction for the officers.  Moreover, as noted above, Schwab's intrusion occurred in a larger context of rioters who exploited their numbers to overwhelm police, breach the Capitol, and disrupt congressional

---

[7] Schwab may not have engaged in the pushing or the force that allowed the crowd to breach the East Doors, but unlike her codefendants and like most of the crowd she entered with, Schwab did not try to exit from the Capitol once inside. The crowd's need for force was an additional indication Schwab ignored that she was not legally present in the Capitol.

[8] A rioter on the steps near Schwab announced he was a 74-year-old veteran as he grew confrontational towards police and resisted officers' efforts to clear the steps.  Officers forced the rioter down the steps in a direction parallel to the front line of officers attempting to move a hostile crowd toward the rioter's right.  At the bottom of the steps, the rioter turned left towards the line of officers preparing to move towards the crowd.  The rioter, while yelling, encroached on an officer in the front line who pushed the rioter away; unfortunately the rioter fell, but with assistance regained his footing without injury.  Schwab grew incensed that an officer would push a veteran. She showed no sympathy for officers who were targets of projectiles and other physical assaults.

25

proceedings.  But for Schwab's conduct, alongside so many others, the riot likely would have failed to substantially delay the certification vote.  *See, e.g., United States v. Jesus D. Rivera,* No. No. 21-cr-60-CKK, --- F. Supp. 3d ---, 2022 WL 2187851 at *6 (D.D.C. June 17, 2022) ("Even the presence of *one* unauthorized person is reason to suspend Congressional proceedings … Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption").

Accordingly, the nature and the circumstances of this offense were serious and establish the clear need for a sentence of incarceration in this matter.

### B.  The History and Characteristics of Schwab

Although currently unemployed, Schwab has held a real estate license and currently holds a license for Personal Lines insurance. She completed 11th grade and obtained a high school general equivalency degree (GED). PSR ¶ 98. Schwab has no criminal history.  PSR ¶¶ 55-61. Since January 6, 2021, she has been in a romantic relationship with Hyland.  *See* PSR ¶ 69.

Schwab has provided the Probation Office with a statement expressing her deep regret and remorse for her conduct on January 6.  In her statement, Schwab acknowledges that she was part of a crowd that threatened police officers and the peaceful transition of power.  She states that "the crowd" threatened elected officials and the media.  She also states that she looks back on her actions "with horror and shame."  Although she offers strongly worded expressions of remorse, she provides little acknowledgment of what she actually did, attributing unlawful actions to "the crowd" rather than herself.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration,

as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the

impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Several factors call for specific deterrence in this case. Schwab committed a crime of violence and incited others to do so. Even before leaving her home for Washington, D.C., Schwab proposed breaking the law in order to confront anticipated violence that she simply could have chosen to avoid. While at the Capitol, she resisted the efforts of officers trying to prevent entry into the building. Later, she incited others to resist the efforts of officers to clear the Capitol grounds. More than once, she celebrated her own violence and her breach of the Capitol over Facebook, even as she acknowledged that her conduct at the press enclosure "wasn't pretty." Schwab's statement to Probation is also concerning, since it neither acknowledges nor accepts responsibility for any specific action forming part of her offense, even after her sworn acceptance of the statement of offense supporting her plea agreement.

Although in some respects Schwab was cooperative with the FBI, her statements reflect a lack of candor. For example, Schwab claimed that police invited her in to the Capitol, which the video surveillance footage flatly contradicts. She maintained that she did not go to the Capitol for political reasons, which is contradicted by her text messages addressing the need to "stop the steal"

or exclaiming "fuck pence." She claimed the worst aspect of her conduct at the Capitol was "chanting," and thus obscured her role in the destruction of property. She falsely claimed she did not recognize a photograph of Hyland.

Each of these details signifies a need for individual deterrence. Accordingly, a sentence of incarceration is appropriate in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Schwab based on her own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: her participation in the January 6 riot.

Schwab has pleaded guilty to Count Two of the Superseding Information, charging her with disruptive and disorderly conduct in a restricted area, in violation of 18 U.S.C. § 1752(a)(2). This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A.  § 3553(6), apply.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".  So long as the sentencing court "correctly calculate[s] and carefully

---

[9] Attached to this sentencing memorandum as Exhibit Two is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *cf. United States v. De La Cruz*, 397 F. App'x 676, 678 (2d Cir. 2010) ("a Guidelines sentence can create an unwarranted disparity") (citing *Kimbrough v. United States*, 552 U.S. 85, 91 (2007)).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range,

differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

A comparison of Schwab with her codefendants is a helpful starting point. Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). All three engaged in similar conduct until their return to the Capitol.  Schwab was the first to breach

the building, where she intruded the furthest of the three and remained for the longest amount of time.  After her exit from the Capitol, unlike her codefendants, Schwab affirmatively urged other rioters to disregard and disobey police clearing the grounds.  Although Schwab and Hyland both screamed insults at police, Schwab was abusive and far more disrespectful towards officers.  And unlike either of her codefendants, Schwab joined in the destruction of property and urged others in their efforts to do the same.  Accordingly, while Schwab's codefendants pleaded guilty to and were each sentenced for a petty offense under 40 U.S.C. § 5104(e)(2)(G), Schwab will be sentenced for her violation of 18 U.S.C. § 1752(a)(2), a more serious misdemeanor offense.  Both her conduct and her offense of conviction support a more serious sentence for Schwab in comparison to her codefendants.

Ryan, who broadcast that January 6 was a prelude to war, spread misinformation to her thousands of online followers, expressed the belief that she was above the law, celebrated the violence of others at the Capitol, was dishonest with the Court at sentencing, and failed to show remorse, received the government's requested sentence of 60 days of incarceration.  Hyland refrained from making statements on social media, appeared candid before the Court, acknowledged his offense conduct, and compellingly expressed remorse. He received a sentence of seven days of incarceration.  Schwab's violence is far more serious than any action of either of her codefendants, and that alone merits a more severe sentence.

This Court can also compare Schwab to other defendants convicted under Section 1752(a)(2).  For example, in *United States v. Matthew Baggott*, No. 21-cr-411 (APM), Baggott entered a plea of guilty to one count under Section 1752(a)(2).  Baggott observed the crowd's aggression towards police officers before he entered the Capitol.  He was in the first wave of rioters who breached the Senate Wing door.  Baggott engaged in violence towards police by throwing an

object at officers.  He was inside the Capitol for more than 40 minutes and stole a police baton as officers expelled him from the building.  The United States requested a sentence in the middle of Baggott's guideline range of 8-12 months.   Judge Mehta imposed a sentence of 90 days' incarceration and a year of supervised release.

In *United States v. Benjamin Larocca*, No. 21-cr-317 (TSC), Larocca also pleaded guilty to violating 18 U.S.C § 1752(a)(2).  Larocca and his codefendant entered the Capitol for 13 minutes and exited from the North Doors to find a crowd using a bicycle rack as a battering ram to prevent police from closing the doors.  Larocca did not participate in this violence but remained indifferent to it.  He did not vacate the area that police were trying to control.  He posted videos and photos on Instagram boasting about his own and his codefendant's conduct.  When interviewed, Larocca was generally forthcoming with the FBI.  The United States requested a sentence of incarceration for three months.  Judge Chutkan imposed a sentence of incarceration for 60 days.  Like Schwab, Larocca was unmoved by the violence of the crowd; unlike Schwab, there is no evidence that Larocca acted with violence.  Thus, a more significant sentence is appropriate for Schwab.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

**V.        Conclusion**

    Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to a term of 90 days of incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of her behavior, while recognizing her acceptance of responsibility for her crime.

                                 Respectfully submitted,

                                 MATTHEW M. GRAVES
                                 United States Attorney
                                 D.C. Bar No. 481052

                    By:      s/Karen Rochlin
                                 Karen Rochlin
                                 Assistant United States Attorney Detailee
                                 DC Bar No. 394447
                                 99 N.E. 4th Street
                                 Miami, Florida 33132
                                 (786) 972-9045
                                 Karen.Rochlin@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

On this 2nd day of December, 2022, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

<u>s/Karen Rochlin</u>
Karen Rochlin
Assistant United States Attorney Detailee
DC Bar No. 394447
99 N.E. 4th Street
Miami, Florida 33132
(786) 972-9045
Karen.Rochlin@usdoj.gov